The next case on the docket is 518-0552 National Material Co., LLC v. The GSI Group, LLC. Arguing for the Appellant Cross-Appellee National Material Co., LLC is Joshua Vincent. Arguing for the Appellate Cross-Appellant, the GSI Group, LLC is Jeff Terosian. You will see the digital timekeeping device on the clerk's screen. Each side will have 20 minutes for their argument. As this is a cross-appeal, both Appellant and the Appellee will have five minutes for rebuttal. In other words, this will be 20, 25, and 5. Please remember only the clerk of the court is permitted to record these proceedings. Counsel, ready to proceed, the Appellant? Thank you, Justice Welch. Introduce yourself. To the record, Josh Vincent on behalf of the Plaintiff Appellant. It's not very loud. Are you standing close to the mic? Yes. Can you hear me okay? That's better. I don't know how to control it. It's controlled by you, Mr. Vincent, your machine. Can you hear me okay right now? Now I can, yes. Okay. I'm sorry. Maybe I wasn't speaking loud enough. It's a little unusual to see myself arguing. Just for the record, I want everybody to know I actually weigh 10 pounds less than I appear on this video. And younger. That's true, too. There's really three issues that I wanted to address this afternoon in my comments. The first is why the damages award is manifestly inadequate in this case. The second is why this court can independently order a new trial on damages only because of two evidentiary errors that the trial judge committed. And the third is why a new trial on damages only is the appropriate remedy in this case. Back in 2016, when this court decided the first appeal in this case in paragraph 21 of that decision, the court focused in on the fact that there was evidence from which a jury could conclude that there was both an agreement on price and quantity with respect to the contract. And when you fast forward now to the trial that occurred, and you look at jury instruction number 12, which is at page C2190 of the record, you'll see that the jury was specifically instructed that in order to find in favor of national material, they had to find that there was a two-year requirements contract, the national material had agreed to buy specified parts in specific lots from us, that there was an agreement on a trailing price index, and that there was, quote, a minimum volume commitment. And so we know that the jury found in favor of national material on that first claim for breach of contract. You know, it's not like this is a general type verdict where we don't know which claim that national material won on. We know that the jury returned a verdict on the first claim, not the second or third. And we know, therefore, that the jury necessarily found that there was a minimum volume commitment. And the only evidence, the only evidence in this case about the minimum volume of the contract came from is the only evidence is because when you stick back and you look at the defense strategy in this case, the defense was that there was no contract at all. They didn't agree to anything. So it's not like GSI took a position that, well, we only agreed to 100,000 tons, or we only agreed to 50,000 tons, or we agreed to this price or that price. That wasn't the defense to the contract. The defense to the contract was there's no contract at all. So by definition, when the jury found there was a contract, it could only find the contract terms or the ones that national material proved in this case, which included the 121,500 minimum volume commitment. So, you know, once you recognize that GSI's trial strategy in this case was a sort of a you're either pregnant or you're not pregnant defense to the contract issue, you come down to the fact that there was an admitted breach of contract. John Hill testified that they absolutely stopped buying product from national material in September of 2008. It is undisputed that at that moment in time, national material had 8,338 tons of specially made products just for GSI only works in their machines galvanized built to their specifications, and they stopped buying it. And the testimony of our expert was that that the trailing index price that was agreed on for the 8,338 tons of steel was $1,329 a ton. And that worked out to $11 million of product we were sitting on, of which we were able to sell 4 million and 4.8, leaving a $6.2 million inventory that we got stuck with. You said, Mr. Vincent, you said 8,338. Is it 8,388? That could be I may have misread that. Okay. I have 8,388. So okay, my my air, but okay, is there really any dispute now as we stand here in the appellate court as to whether there's a contract? No, no, no dispute at all. The you know, the point that I guess I'm driving at is that there's no way to connect the jury's $1.7 million verdict in this case, to the undisputed evidence of resale damages, which was $6.2 million. Well, it's clear, it's clear the jury did not follow the jury instructions. That's correct, Judge. And that's exactly what we think happened. And did you not know about the note until after the jury was discharged? Yes, that is correct, Your Honor. Judge McCaney, you know, was apparently handed the verdict form with the with the jury's note, read the verdict form, then pulled the jury, the jury was pulled, pulled the jury, Judge McCaney then discharged the jury. And then after he discharged the jury, he called the parties up and said, Oh, hey, wait a minute. This is a first for me. Here's a note that was, you know, given to me with the verdict. And there's this note from the jury that says it all talks about is the damages. It says we took the $6.2 million figure, we added to the $793,000 figure for lost profits. That was what GSI's expert testified about. And again, you know, I want to emphasize, GSI's expert, they never challenged the resale damages. I mean, this was, if you look at the cross examination that Mr. Schmetter did on Mr. Cobb, our expert, he never challenged the resale damages. He said, your testimony about the damages is based on your yes. But that was the only attack on it. We know the jury found that there was a contract with a minimum volume commitment. But that was the only attack. Spry, GSI's expert, admitted openly on cross examination, I think it's page 1109 of her testimony. She admitted flat out that she had no opinion whatsoever on the resale damages component. She was only testifying about lost profits. So again, this $6.2 million figure sits out there. The jury's note indicates they didn't follow the instructions that said you add those two numbers together. You don't take those two numbers, find the average, and then cut them in half. I mean, that just comes out of nowhere. There's nothing in the instructions or the testimony of the experts that would support that method of calculating the damages. And in a contract case, where you are- Well, let's assume, let's assume that you would have known about the note before the jury was charged. Do you think that the jury could have returned to the jury room and been told to follow the instructions? We have a new rule on that now. But this was tried before that. I do think, yes, and I do think that the jury could have been directed to return to the jury room. I'm not sure exactly what instruction would have been given, presumably some type of a shotgun instruction that wasn't emphasizing one thing or the other. But to read the instructions on damages and to come back with a different version. So, yes, that would have been the remedy. And I think, you know, when you think about was there an abuse of discretion, which is part of this, I mean, that's part of the standard of review we're dealing with here, you know, would, can you say that no reasonable judge would have told the parties before discharging the jury that there was a note and that we should talk about this and maybe send the jury back? I think that was abuse of discretion not to have told the parties about the note and give us the opportunity to have the jury go back and decide the damages. They had obviously reached a conclusion on the verdict on liability. I'm just curious. First of all, I thought both briefs were very well done. So like to commend you both on those. But the my question is, assuming that there was no note found, but the jury verdict was what it was, what would have been the position? What would have been the strategy at that point? Oh, I think at that point, we'd be right back to the post-trial motions and the position that the damages were, you know, either manifestly inadequate, which we believe they are, or just have absolutely no relationship to the evidence that was adduced in this case. So the note itself didn't prompt the position that you're taking. It was the amount, period. No, it's purely the amount. I mean, we can decide the case without the note. But I think the note helps inform the analysis. I think it demonstrates that the jury did accept the 6.2 lost profits figure, that it did accept the $793,000, I'm sorry, $6.2 million resale damages figure, the $793,000 lost profits figure. And that's why we've asked for Aditor as one of the remedies in this case, that you mold the verdict into what the jury's intent was. And we think the jury's intent was to award the roughly $7,027,895 that those two figures, when added together, create. So that's the remedy there. But I think you can do it with or without the note. Either way, it's either inadequate, or it's manifest, it has no connection to the evidence. And that's the point. You can't tie this number to anything. I mean, Spry gave either $793,000 or zero, and our side said the damages were $7.4 million, actually more than that. Roughly $7.4 million. And so where does this jury's number come from? It's not based on any of the evidence. So it's kind of a classic case for a new trial of damages only. Independent of that, we do have two trial errors. So we know from GSI's brief, that they've told us they're not going to accept an editor if you mold the verdict into the $7 million that we requested. And so if it is going to have to go back for a new trial, we do have two significant evidentiary errors that would need to be addressed for purposes of remand. And one is, you know, the trial Judge Bard, our experts updated report. And that report was kind of critical. I mean, that was a million dollar difference in the lost profits calculation. And what's really kind of incredible about it is we're talking about one mathematical change. It was the discovery that the cost of the parts was actually $0.75 per 100 weight less than what we thought they were, because original calculation was based on winning the entire bid. It turned out we only received 50% of the parts when we were awarded the contract, and they didn't make that adjustment. So that was the only change that was made, the experts report. And yet- Mr. Benson, I had a question about that. I apologize. Was there a case management order that set cutoff dates for you? I am not aware of a cutoff date. There was a date that we were required to make our initial expert disclosures. And that was, I believe, in, I want to say, April of 2013. But by the time we, went through this appeal, and trial counsel changed for the case, and we came back and we discovered that information was missing. And I guess this is another point. The issue on this particular ruling really kind of transcends this case, because it demonstrates that the judge did not have a clear understanding of the purpose and meaning of rule 213I. I mean, 213I requires the parties to seasonably supplement an expert report. I mean, that's, you know, for a plaintiff, that's critical, okay? If you've got additional information, and you want to get it out there, and you do it well before trial, there's no reason for that to be barred. And in this case, the judge said, you know, his reason was that discovery is like gas, he said. And it violates those rules, without saying what rules he was referring to. And so here we were, three months before the original trial date, with this supplemental report. So there was plenty of time, it was not, you know, it wasn't late in the game on the eve of trial. And then, when the actual order was entered, barring the supplemental report in January of 2018, we were nine months from trial, because the trial date had been changed, and the judge even acknowledged we're not on the eve of trial, and yet he still barred it. And so I think that was a clear error of law, misunderstanding of 213i, and that by definition is an abuse of discretion. So we need that fixed for remand on trial, if we're going to have a new trial on damages. The other issue that we brought up with regard to trial there, was the testimony of Mike Fergus, who was the vice president. And again, kind of an important issue that transcends this case, because the judge seemed to think that if it's expert testimony coming from a lay witness, it's barred. And in this instance, it wasn't expert it wasn't scientific, it didn't fit any of the categories of expert testimony, it was lay opinion testimony by an employee of our company, the vice president general manager, who had personal knowledge of the figures that, you know, kept all the calculations of our lost profits and resale damages. And that's what he tried to testify about. And you can see from the exhibits, that that there was an extensive offer of proof on this, by the way, so you can see exactly what it's all based on this personal knowledge. But these are exhibits. Whoops, where'd it go here? PX 84 and PX 112 were the two exhibits. And those were plaintiff's exhibits. Those were national materials records. They have all the information about how lost profits and resale damages were calculated. These were the inputs that our expert Cobb used. So it was highly prejudicial to, you know, not only bar the expert from using the correct mathematical information, but to also bar the party's witness who was able to supply that information that the expert would use. So it was it was pretty prejudicial. Could it have been deemed cumulative though, since your expert was allowed to use it? I think it wasn't to the extent that it would explain why, you know, that's the thing. If an expert seasonably supplements his report, he's exposed or she's exposed to cross examination that they change their opinion. So you need to have an explanation as to why the opinion changed. And these were the inputs from the from the party's witness who had all the facts and figures that changed the expert's opinion. So I think the two kind of go hand in hand. Is it my understanding that Mr. Fergus is the one who actually created the numbers that he was willing to testify about? Well, these were these were spreadsheets that were derived from national materials, actual books and records. I mean, that's part of his job is to maintain these records, to know these numbers, to calculate our profits and losses. And so all within his personal knowledge. But Justice Barbaros, I think was asking whether or not correct me if I'm wrong, but I think he was asking whether Mr. Fergus actually prepared the documents that you're trying to talk about the spreadsheets, for example, I believe that he did. Yes, I believe that he did. They're all derived from the company's records. You know, the last point I wanted to touch on is so let me ask you this if so it's your position that the court should not order editor because of the representations made by the defendant. Yes, I thank you. No, actually, actually, Judge, I think it would be a good thing to order the editor because, you know, as a practical matter, a finding like that by the court that this was what the verdict should be, you know, sometimes that can drive a resolution of the case. Sure. That's what I you're exactly right. And that's what I was wondering, because you started out by saying, I think we need a new trial, but yet we do have the ability to order the editor and in the event the parties don't agree, then. Yes. So what relief exactly would you like to see Mr. Vincent, Your Honor, we'd like to see an editor increasing the judgment amount to $7,027,897. We'd like a finding that that we are entitled to prejudge an interest on that amount, because we are talking about a contract for the sale of goods that the jury found was a meeting of the minds for a specific minimum quantity at a specific price, easily calculated. So we think we're entitled to the prejudgment interest on that. And that's not a number. That's not a number that we can add. Is it? No, no, no, that would just be something that that would have to be remanded for calculation of that number. That is correct. How would we make that finding based on the record? How do we do that? Well, the jury didn't get a special interrogatory on that. No, they did not, because the judge refused to grant us that relief of the request for the prejudgment interest. I think, actually, I think this is a number that could be easily calculated. And we have provided that information in our brief. That's one thing I didn't write down here on my key facts to provide for you right now. But we do have a number it's on the $7 million in damages, and it would run from the end of the contract term, December 31st, 2009. And it's the simple 5% interest calculation that is provided by the Interest Act. So that would that would be our request. So within the appeal, you've also asked us to set aside the judge's ruling on the prejudgment interest? Yes, that's correct. And, and if you know, GSI will not agree to a new trial on damages, or I'm sorry, to an editor, then yeah, then the only alternative is a new trial limited to the issue of damages. Again, we need the ruling on the two evidentiary errors. And we would need the trial judge directed that prejudgment interest is to be awarded. Okay. Thank you. The court has no other questions. I'm waiting 45 seconds. Well, if you'd like microphone, happily may proceed. Thank you, Your Honors. Your Honors, as Justice Barberas noted, nearly the entirety of NMC's appeal is based on a piece of paper that has zero evidentiary foundation and cannot be considered by this court. First, it's important to accurately describe what we know about how and where the trial judge actually found this piece of paper. I was lead trial counsel, Mr. Vincent was not at trial. What piece of paper are you talking about? The jury, what what counsel calls the jury note, which is, you know, there's meaning in the definition that he gives it. I don't acknowledge it's a jury note. I acknowledge it as a piece of paper. The record shows that Judge McHaney pulled and dismissed the jury. The jury gathered their belongings and left the courtroom. And Judge McHaney then noted on the record that he found a piece of paper. It was not attached to the verdict form and wasn't even right next to the verdict form, despite NMC's appellate brief where the appendix shows them next to each other. That's not how it was at trial. It was in a stack of papers that were collected from the jury. Judge McHaney then said after the jury had left, quote, well, there's just a note here. It's not on the verdict. I don't know what this means. So there's no chain of custody that's been established. And we don't know where this piece of paper came from exactly. The piece of paper is unsigned. It is unsworn. It is unauthenticated. It is unattributed. We don't know who wrote it. And we don't know if more than one person wrote it. We don't know who the we is in the description of the calculation. Is that we, the jury, or is that just two people on the jury, three people on the jury, seven people on the jury? Was this calculation used to support a jury vote to convince others during the deliberations? If written during the deliberations, there's no indication of when in the deliberations these calculations were made and whether they apply to the final verdict or some prior vote or discussion or consideration. Well, wasn't the final, excuse me, wasn't the final verdict consistent with the note? No, and I'll tell you why in two different ways. First of all, the note's calculation was wrong by the description that was used. The note said it did two things. One, it took an two separate calculations. And when it came, the note actually has a figure that is the result of those calculations, but that figure is $25,088 off than the calculation described. So the description of the calculation is over $25,000 different than the result of the calculation. And then even the verdict form has a 25 cent difference than that result. So I know it's 25 cents, but it's different. There's no indication if these were written during the deliberations at all, or if they were written during the trial itself. We don't know where it was written, if it was written with others present, if it was written at home during the trial and brought to jury room. We don't know if it was written all at once, or if the calculations were done at a separate time or place. And again, as I said, the calculations that are described don't match the calculations that were done. $25,000 and change is a real number. And the amount written on it doesn't match the amount written on the verdict form. The bottom line is we have absolutely no clue about this piece of paper. And even the trial judge didn't know anything about it or what it meant. Neither Judge McHaney nor anyone else in the courtroom even knew it existed until after the jury gave their verdict, were fully polled, and were formally released and actually physically left the courtroom. Judge McHaney considered NMC's argument about this piece of paper in post-trial motions and did not abuse his discretion when rejecting their attempts to use it as an excuse to overturn the verdict. This is an abuse of discretion standard. NMC's interest in this piece of paper is even more curious since it doesn't even support what they want to do with the damages verdict. NMC... Mr. Turozian, let's put that aside for a minute. Let's just throw that out in a box. Sure. The verdict that was entered, as I look at the transcript, there was no dispute by GSI as to that 6.296319 number. And you didn't have an expert to dispute that at all. I disagree with that, Your Honor. Okay, well tell me who disputed that number. Well, first of all, in cross-examination, counsel is wrong. We didn't just dispute the assumptions. Resale damages figure, let's call it. Understood. We didn't just dispute the assumptions that were given to Mr. Cobb in connection with what contract he was assuming was breached. We actually went through and disputed almost all of the inputs he used, and Ms. Spry then looked at the resale damages and said, if you're going to apply resale damages here, at most there are 400... I think it's a little bit less than $500,000 of resale damages. But she didn't think there were any resale damages because she's allowed to assume certain things too. And her assumptions were that these products were not available when GSI needed them. The only testimony of trial on the inventory was from Mr. Baker for GSI who said, every time I needed a product on that list, I went to NMC first. And NMC either didn't sell it to me because they had already sold it to someone else, or it was rusted and they didn't have it available for me in good form. And so every single time I went somewhere else. And so Ms. Spry considered that too. But she said, even if you don't consider that, her input said there was less than $500,000 of resale damages. And separate and apart from that, we cross-examined Mr. Cobb and did attack several of the aspects, the key calculation. For instance, we challenged and disputed his use of the highest price for each piece of inventory. He actually looked at the inventory and gave it a price, but used the highest price, assuming that inventory would be purchased immediately at that moment. But remember, there was no dispute here that if there was a contract, there was no requirement that any piece of inventory be bought in any specific time. It was just over two years. That was it. And so to the extent that GSI would need to buy some of this inventory, it could buy it at any time. So we did dispute Cobb's calculation, for instance, on price, because he looked at one point in time on price, which was the highest time, the time at which the price was the highest. Instead of saying, well, prices were declined, what if GSA bought this two months later? Damages would have been less. And we did attack each and every one of those. Also, Mr. Cobb didn't employ the most favored nation clause. In the last version of the agreement that the parties exchanged with each other, there was a most favored nation clause. Mr. Cobb did nothing to look at that. He did nothing to see if NMC actually had most favored nation pricing for GSI, or if they were giving other customers better pricing. He didn't consider the timing of these sales, the declining prices that were actually happening each month by month by month. Just for clarity, let me ask you, when you're suggesting that sell the products to GSI, was that the products that allegedly NMC had bought during the 2008-2009 contract period, and were those offers to buy those materials made during that contract period, or was that after the 2008-2009 contract, when the parties were trying to play nice, if you will, and make up for any materials that they hadn't bought during that 2008-2009 period? Right. So, it's the same materials, and that's the difficulty in how NMC has structured this case. It's the same inventory that they're talking about. So, the parties had a dispute that any contract existed, and then there was this pipeline inventory that NMC had supposedly made or had available for GSI for anticipating GSI's purchase needs. And remember, there's no requirement that anything be bought at any one time. GSI could have waited the whole two years and satisfied any minimum volume commitment on the last day of that two-year period. But NMC thought that they had a pipeline inventory and wanted to get rid of it. And so, GSI disputed that. The parties entered into the 2009 agreement that had specific pricing, and GSI, after that 2009 letter agreement, every time it needed inventory that was on that list of pipeline inventory, went to NMC first. But I guess my difficulty in understanding this is, so this is a practice that both parties or both companies have been involved in for years, decades, if you will, of selling these particular items from NMC to GSI. And presumably, NMC had, in the past, bought large quantities of these so knowing the, if you will, shelf life of the materials, why would NMC buy so much product, say for the 2008-2009 alleged contract, that it would go bad on the shelf? As you said, even if GSI didn't come to them on the very last day of that presumed contract and say, we want all of it, wouldn't they have only had enough? They would have known that we can't buy so much that it's going to go bad before GSI buys it. The only logical thing in my mind seems to be that if NMC had bought enough product for that two-year contract period and didn't sell it, and then GSI came to them a year later, beyond that two-year period, and said, hey, we want to buy this product, well, then that product had gone, as I called it, bad on the shelf. They had to unload it for rust and corrosion, whatever was going on with it. Then they didn't have it available. Is that the scenario that took place? Not entirely, because first of all, this was an entirely new process. This was not part of a course of dealing that lasted 20 years. This was all new senior management, all new purchasing agents, and a new contract that parties had never operated. If there was a contract, we didn't think there was, but the parties had never operated under a contract before. There is no specified actual term that says, you give me a forecast, and you're obligated to buy on that forecast. They've never actually alleged there was such a term. They simply said there was a minimum volume commitment. They're not even clear on what the minimum volume commitment is, but they actually said there was a minimum volume commitment. Now they're saying at the end of the day, you had to buy the inventory that was in the pipeline. If that's true, and if we didn't need it right away, there's no dispute that we had to buy it right away. They've never said that. It's not in the 09 letter agreement. We've never had to buy it right away. If they had to, they could sell it to anyone too. They could sell it and unload it. If they couldn't unload it to anyone else, and they had to have it available to us, they could have stored it in a way that it wouldn't rust. They knew how to do that, and the testimony of trial was they failed to do that because they didn't want to. Sure, and you understand I'm not trying to get you to admit that there was a contract for 2008 or 9 or anything on the record right now. I'm just trying to understand if at the time that you're suggesting, GSI went to NMC and said, hey, we want to buy this product, and they said, sorry, we don't have it. We've sold it. It rusted, whatever. Was that close to the time of the alleged two-year contract, or was it months or years after that when they went to NMC to purchase those materials? It was within months. Because remember, the 09 letter agreement was January of 09, and so at that point, the parties, we agreed. We agreed to the 09 letter agreement. There's no dispute that that was a real agreement. We agreed. We think it resolved all issues on the disputes before that, and I don't think that's breach of contract, waiver, and at the very least, and this is something lost on counsel for NMC, at the very least, it is uncontroverted that that letter agreement settled any dispute on the pipeline inventory. There's no dispute on that. NMC's general manager and president both testified that that letter agreement resolved, we think it resolved everything, but they think it resolved the pipeline inventory dispute, and that's actually pretty important because that's the damages they're trying to add here, and they didn't even ask for a verdict on breach of the 09 letter agreement. The 09 letter agreement, immediately after January when it was signed, every time we needed a part on that list, we would go to NMC, and if they had it, they'd give it to us. If they didn't, we'd go elsewhere, and their testimony was uncontroverted that that's what we did every single time. They also could sell it to someone else if they wanted to, and there was no problem with that, but the testimony at trial is that 09 letter agreement absolutely resolved all issues on the pipeline inventory at the very least, and what counsel is trying to do now is say you can't use the jury, though. I mean, the Illinois rule of evidence 606 is absolutely crystal clear. The cases we cited in our brief by the Illinois Supreme Court, which is the Redmond case that was decided in 2005, makes clear that even before the rule of evidence came into play in the Illinois High Court in 2005, you cannot consider anything, any notes, any affidavits, any declarations, any depositions of jurors to find out what their motive or intent behind their verdict was. That is absolutely forbidden, and that's why I asked Mr. Vincent earlier, assuming that the letter is not even there, they don't even find it, what was the position of this time, and we'd be still in the same scenario. You know, I think I disagree, Justice Barberos, because we wouldn't be in the same scenario, because we'd have a jury verdict that basically says 1.7 million or so in damages, 1.731886, and we have a claim by a plaintiff as to a contract with several different terms that were disputed, and Justice Cates, I disagree with you that there is no dispute that the jury found a contract. I agree with you, there's no dispute on that, but there is a dispute on what exactly that contract was. Remember, one of the jury instructions that NMC agreed to said, here's our contract, and the contract they described was no mention of pipeline inventory. That is an absolute disputed term. No mention of it in the jury instruction that they agreed to. So the jury could have looked at that, looked at the jury instruction, and they could have found a two-year contract with a minimum volume commitment. We don't know what the volume commitment was, because NMC counsel just said there's no dispute that he had a minimum volume commitment of 121,500 tons. That's absolutely not true. They have changed that position at every iteration in this case, and even in the appellant's brief, page 37, says that the minimum volume commitment was 135,000 tons. So the jury was not told exactly what the minimum volume commitment was. The jury instruction didn't say what NMC thought the minimum volume commitment was, but the only term in the contract as described in the jury instruction that NMC agreed to was that there was a two-year agreement for a minimum tonnage of some amount, and the jury then was left with that, and left with, if there was this other term, it was probably waived by the letter agreement, and they came out with a verdict that is very close to the lost profits that were claimed by NMC. There is no doubt that this court cannot change a verdict if it is within a reasonable, flexible range of options that were given to a jury, and this jury had the option of finding a contract, finding either one term or both terms, and then the other term was waived. It could have done all of those things. It could have found for lost profits on a which numbers varied by NMC's presentation throughout the case and the testimony, and it could have then came back with a verdict that had basically given NMC the lost profits that it was seeking. It was about the same amount as the verdict that the jury gave. So without that jury note, this appeal is over. What about the, I'm sorry, I'm going to take you over your time, but I've been listening very carefully, so I didn't want to interrupt you. I have a couple just questions. What about the failure to allow Mr. Fergus to testify? So thank you. First of all, Mr. Fergus did testify. He testified at length. No, but I mean about the information that he was barred from testifying. Let's just limit the issue to that. That was appropriate ruling? I think it was. So first of all, there was some smoke and mirrors at trial on what the document was that Mr. Fergus was testifying about, and if you really look at the transcript hard because it was confusing, and I believe there was some smoke and mirrors by NMC at trial that whether or not this document just existed in NMC's files, it did not. This was a document that had, you'll see in the transcript, information to the right. It was a huge spreadsheet that had calculations that Mr. Fergus made in advance of trial for the purpose of trial. We had never gotten this document in discovery, and then what information did Mr. Fergus... When did you get this document? Well, we saw it at trial. Not before? No. You remember there were over 5,000 pages of documents that were actually barred by NMC because they were late produced, and they were late produced because Mr. Fergus said they were sitting on the floor of his office, and despite discovery having been closed for five years, and there was a case management order, by the way, there were expert disclosures required four years before trial. Yeah. You enter into a case management order, and you let it sit for five years, and then attempt to enforce it. No new case management order. The court never met again, never revised the order. Having been a litigator a long time, I find that kind of odd that the parties didn't get together and revise that. Well, there was no need to revise it from our perspective. We didn't sit and wait on this information for years. We got handed an amended expert report that had dozens of new pages. It wasn't just a simple calculation change like counsel said. No, I understand that, but what I'm concerned about is that you're trying to implement an order that was out of date, basically. It was based on litigation that was up on appeal, then back, and the disclosure was given to you at the time three months in advance, which the rule only requires 60 days if there's no cutoff, which I couldn't find in the record. Then by the time he whether or not it was admissible or not, I don't really know, because National Materials was never really given the opportunity to have their witness depose, or you would depose them. I really kind of wonder what harm it would have done to allow that to be admitted. Can you help me with that? Sure. Let me explain some of the circumstances. First of all, expert discovery was extended, and then closed before summary judgment briefing on the first appeal. In what year? It was like 2000. I think it was 2014. I think expert disclosed. I think it was 2014, memory serves. Then we went up on appeal. It wasn't the entirety of the appeal that the delay happened. There was a delay before and then a delay after. Then after, we get 5,000 pages of new documents that were sitting on Mr. Critical to expert discovery and Mr. Fergus testimony. That was like October. Right. What do we do then? We accepted some of those pages to the extent that there was some sort of basis for them either being same versions of documents we already had, but we sought to bar the late production of those documents because they were not seasonably produced. If you have to seasonably produce things, you get to do them whenever you look around the floor of your office. The judge barred those documents, and that's not part of the appeal. NMC never complained about that. They didn't preserve that issue for appeal at all. Mr. Cobb relied on those barred documents when he submitted an amended expert report. First of all, you can't rely on documents that were late produced and barred, and they're not even seeking to overturn that. Mr. Fergus, we actually redeposed them based on some of the late produced documents. Then after that, we get this purported revised expert report. It was trial judge said, and I think this is right, that are we going to redepose Mr. Fergus again, then? Are we going to redepose Mr. Cobb again? Now we have to submit our own counter expert report because don't forget, we have a right to rebuttal experts too. Now we're going to go through that whole process. That's a year-long process when these were four years too late. I got to say, I understand you have to submit amendments seasonably, but it's got to be seasonable. You have to give some effect to case management deadline. I understand if a party is going to miss a deadline by a day or a month or anything less than four years, maybe that's a different scenario, but you don't judge this just by based on how far out is trial. Otherwise, it'd be chaos in the lower courts. Who would ever comply with the case management expert disclosure deadline? If you can do it two months before trial and you're no worse for wear. That would be a very bad decision from an appellate court to say, it doesn't really matter. Four years late is okay because you had two months before trial to redo your rebuttal expert report, to redo all of your, and don't forget, we had evidence depositions that are already taking place. Thank you, counsel. I don't think there's any more questions. We'll go ahead and go ahead with the rebuttal. Mr. Benson. Thank you, Justice Welch. I want to go specifically to the questions you asked, Justice Barberis, about the pipeline inventory. Can you hear me okay now? Now, yes. You have to understand that the terms of this contract were that we had to have product ready for delivery on 24 hours notice. We're talking about hundreds and thousands of tons of steel on 24 hour notice, 20 to 25 truck loads per day going to their plant so that they can make their product. And so when you talk about a minute, there's a minimum volume commitment for the entirety of the contract, but there's also the need to be able to, this is what they call lean manufacturing. You got to be able to have it there on time. And that means you also have to depend on the forecast they give you month to month as to what their needs are going to be. And so when you talk about that pipeline inventory, it's the pipeline. It's what you have to have because it takes eight to 12 weeks to get the product that you have to have it in place so you can not be in breach of your contract and provide them with the material on demand, which is what they require. And so when we talk about that pipeline inventory that's in dispute here, this is product that had to be ordered in August, the August timeframe for delivery during the final quarter of 2008. And as you correctly pointed out, it does have a limited shelf life. And so you're anticipating based on their forecast, what they need and having it at the ready to do it. But it's a breach of contract if they suddenly stop buying it, which they admitted they did, and start buying it from a competitor, which they also admitted they did. If you look at PX81, PX93, and the testimony of John Hilt at 1175 and 1182 to eight, as well as Mr. Baker's testimony, they spent during that last quarter of 2008 when they were supposed to be buying that they bought $9.8 million of the exact same parts from our competitor, Performance Steel. So yeah, now it's sad. Now it's sad because it wasn't purchased when it was supposed to be purchased. And then we do have the letter agreement that's entered into in January of 2009, that is an effort to mitigate the loss. And the pricing on that was lower to try and resolve that ever reached this question. But the point is, they continue buying the products from our competitors. And that's in the record as well, that they did not they bought, I think like 400 tons of the pipeline inventory, maybe in the spring. And yeah, by that time, many months have passed. And it was some of it was starting to rust. And some of it had to have been salvaged. You know, I mean, if that hadn't been what occurred, the argument that we'd be facing right is, why didn't you do something to mitigate your loss by selling the stuff as scrap, and instead just letting it sit. So we did exactly what the law requires, we tried to mitigate, they didn't honor the letter agreement. You know, as time went by, we gradually in our brief lays this out had to eventually scrap much of that material. But that pipeline inventory that was purchased for that fourth quarter of 2008 was at the price that was agreed to, you know that those lots of parts are based on that trailing crew index. And so we know what the price was for them at the time they were purchased. And that's what that's what pegs the price that they have to pay for it when they take it, but we're supposed to take it in the fourth quarter of 2008. If I understand correctly, then the the material that was lost due to, you know, expired shelf if you will, yeah, product that was purchased by NMC in August of 2008, anticipating that it would be used by the end of 2008. Correct. And based on their forecast, I mean, they were forecasting that they needed 10,000 tons of steel in the fourth quarter. And we had 8600 tons, we didn't there's a little bit of a lag. So I'm trying not to talk over you. But the the and then there was some testimony that I suppose NMC suggested that GSI decided because of the volatile market at the time in that fourth quarter, they went to spot by rather than buy from the contract during that time. Yep. And you had some evidence of such? Oh, yeah. So then the material that NMC had bought in August of 2008, expired for the for the if I'm understanding this correctly, for the reason that it wasn't purchased in the timeframe that it was expected to be used? Yes, that they had forecasted they would use it. The other thing I want to point out, Judge, is if you look at PX 92, and Mr. Hilt's testimony at our 1165 to 68, they made a list of all their options when the prices fell off on steel in that Latin in September, October of 2008, the recession was hitting, they made a list of all the things they could do about how to get out of this contract. And then the last option that Mr. Hilt GSI came up with option number eight was to break the contract and walk away from it. And they would save $6.84 million by going to the spot market, which is almost I mean, that's very close to the resale damages that we're facing here. That was what they say that was that was our money. That's why they broke the contract. That's why they that's why they did it. So I mean, it's the about the argument that the 2009 letter agreement resolved all of the pipeline inventory dispute. Well, I have two things to say about that. One is the jury was instructed that if they agreed with that there was a waiver defense on the first claim for the breach of contract. They said that as an affirmative defense, that the letter agreement constituted a waiver of our all of our rights under the 2008 2009 supply agreement. And if the jury found that that was true, then the verdict was supposed to be for GSI on the first claim and the jury did the jury found in our favor. So they clearly rejected that flat out. There's no partial waiver. It was either all or nothing that we've waived it or we did. The second thing I would say is from an evidentiary standpoint, you know, there's there's a draft letter that the parties exchange where they were trying to resolve everything. But the letter that was executed was strictly limited to the pipeline inventory with an addendum to it that identified all the parts they promised to buy. And there was evidence that 10 days before they signed the letter, they had already placed orders for the very same parts from our competitor. That was admitted by Mr. Baker, or Mr. Yeah, Mr. Baker admitted that. So there was never any intent to honor that at all. And I guess the last thing I'd like to say is, you know, Mr. Trerosian says that they challenged the resale damages that I would, we'll stand on what we said happened in that transcript. If you read that transcript closely, you'll see that the cross examination they did of our expert cop was strictly about the letter agreement pricing, the pricing for November, December of 2008 parts purchased then, because that was where they were fighting. So we're talking about the lost profits. It's a 14 month period. November, December, through the end of the following year, because we had purchased product August for that last quarter. So now we're talking about what are we going to have to buy in November, December of 2008, to feed them in 2009, first quarter. Now those prices, there was fights over that because that affects the lost profits. So and they did this throughout the trial, you know, they played this game where they talk about the cost of the parts and the prices for the steel. And it all relates to the letter agreement, which was different pricing. And, you know, has nothing to do with the value of the inventory that was in the pipeline that was intended for the fourth quarter. So I mean, I see your time is up now. Council Trerosian may proceed. Go ahead. Thank you, Justice. You know, when this case was before this court four years ago, Justice Jury's province to determine what terms comprise the contract, end quote. And you said without making any determination on the merits of any of those issues, because it was only before you on summary judgment, you said, quote, as a jury that will decide these issues. Now that NMC got what it wanted, it got this case to go to a jury, but now wants to take the decision out of the jury's hands, gives no credence to any aspect of what the jury did, whether it be the note the what they call the jury note, or even just the verdict itself. And they want to change the verdict. They have not met the extremely high threshold in doing so. The union planners case makes clear that the counsel for NMC in order to be successful must show some proven element of negligence. And that is that the verdict of the NMC in the absence of any evidence of damages was ignored. The verdict resulted from passion or prejudice, or the board award for no relationship to the loss suffered. And to get through that they have to show that this verdict does not fall within a flexible range of conclusions, reasonably supported by the evidence. That's their burden. Excuse me. I have you know, I've never objected. Let's finish the argument. Go ahead. It's supposed to be a rebuttal on the cross appeal. And he's arguing the final word in my appeal. No, let's worry about that later. Council. Yeah, it is. It is inappropriate. I agree. You're you're limited to your cross appeal, Mr. Trojan. Okay, well, your honors, then, then we should discuss my cross appeal because my cross appeal has several elements to it, which are J and OB requests, and then conditional trial errors that were conditional only if there's a new trial. And let me let me focus on one that counsel just gives short trip to. And that is the jury had to find a waiver here because there was only evidence that that letter agreement was a waiver of the issues. At the very least, that was a waiver of the pipeline inventory to the extent there was a pipeline inventory claim here. To the extent there was that that was part of the contract, the jury was only able to find that that letter agreement was a waiver. The testimony from Mr. Fergus, and the testimony from the former president of NMC. So their general manager and president both said they had disputed issues. The parties got lawyers involved, they lawyered up, they had meetings from the most senior management of both sides, and then entered into this letter agreement that Mr. Fergus's words described as resolving fully and completely resolving all in dispute. And so that ruling that uncontroverted testimony establishes that we should obtain J and OB on the two year contract term on the unjust enrichment claim. So it's interesting to me because of your cross appeal, because your argument thus far has been that the jury's flexible range of what could have been awarded. But now you argue that no, we were entitled to judgment notwithstanding the verdict, which in order to obtain that you aren't you having to say that the jury's verdict didn't bear a substantial relationship to what you were asking for? I think that's intuitive to me. And this goes back to the great question that goes back to Justice Barbera's question about the jury, because this whole appeal falls apart on their side, based on the jury. I don't think I don't know that that's true, necessarily. I don't place a lot of emphasis on that. No. Well, let me let me explain why. The reason is, we the parties have absolutely no idea what the jury thought. We don't know if the jury thought there was a part it really doesn't matter for you to ask for a J and OB. On the one hand, you're saying a million seven is within a reasonable range. And on the other hand, you're saying, take it away, because it's not within a reasonable range. I'm entitled to that the jury basically didn't follow what I asking for? Well, we're certainly asking on a cross appeal basis for J and OB on all of these claims. Absolutely. We are seeking that because we think the testimony was clear that that was a waiver of everything and should have been treated as such. And so we don't even think we need to look at what the jury thought on that issue. Because the judge could take it out of the jury's hands by saying there was no testimony that it's anything but a waiver. But if you deny that J and OB request. Thank you, counsel. Case will be taken under advisement. You'll be notified in due course. Thank you, your honor. Thank you. Thank you, gentlemen.